# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 23-0591V

| | |
|---|---|
| STACY RODRIGUEZ, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: June 23, 2025 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Eleanor Hanson, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On April 26, 2023, Stacy Rodriguez filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered from Guillain-Barré syndrome ("GBS"), causally related to an influenza ("flu") vaccine he received on September 23, 2021. Petition at 1. The case was assigned to the Office of Special Masters' Special Processing Unit (the "SPU").

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Respondent conceded that Petitioner should be compensated for a Table flu/GBS injury in June 2024, but the parties were unable to resolve damages, so I ordered briefing on the matter. Brief filed Dec. 2, 2024, ECF No. 29 (seeking $160,000.00 for past pain and suffering); Response filed Jan. 31, 2025, ECF No. 30 (advocating for "less than" Petitioner's number); Reply filed Feb. 18, 2025, ECF No. 31. **For the reasons set forth below, I award $145,000.00 for Petitioner's past/actual pain and suffering.**

## I.    Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining GBS damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I – II of *Ashcraft v. Sec'y of Health & Hum. Servs.*, No. 23-1885V, 2025 WL 882752, at *1 – 4 (Fed. Cl. Spec. Mstr. Feb. 27, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[3]

## II.    Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The parties agree, and my own review of the evidence confirms, that at all times Petitioner was a competent adult with no impairments that would impact awareness of the injury. Therefore, I analyze principally the injury's severity and duration.

In performing this analysis, I have reviewed the record as a whole, including the medical records, affidavits, and all assertions made by the parties in written documents. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases and rely upon my experience adjudicating these cases. However, I ultimately base my determination on the circumstances of this case.

---

[3] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

The evidence shows that upon receiving the at-issue flu vaccine on September 23, 2021, Petitioner was 53 years old and employed as a security guard. His preexisting diagnoses included iron deficiency anemia and obesity. *See e.g.*, Ex. 2 at 51, 75.

Petitioner's GBS initial course was typical if not mild, when compared to that of other individuals suffering that same condition. He endured a delay in diagnosis (with GBS not recognized at the first two emergency department evaluations and two chiropractic sessions). *See generally* Ex. 3 at 16 – 91; Ex. 4 at 75 – 76. Ex. 7 at 5 – 10. But a November 9, 2021 neurology outpatient evaluation correctly identified GBS onset symptoms of absent deep tendon reflexes in all four extremities; absent patellar reflexes; a wide-based gait; a positive Romberg sign;[4] and decreased sensation in the hands and feet. Ex. 4 at 25 – 28.

That same day at the neurologist's urging, Petitioner followed up in the emergency room and was admitted for further evaluation (including a lumbar puncture, and cerebrospinal fluid analysis) and treatment (primarily a two-day course of IVIg, and physical therapy ("PT") sessions). Petitioner did not suffer any severe nadir of GBS; interventions; complications; or indication for inpatient rehabilitation or long-term pain measures, and he was discharged from the hospital to his home after just three days, on November 12, 2021. *See, e.g.*, Ex. 3 at 124 – 27 (hospital neurology consult), 181 – 86 (hospital discharge summary);[5] *compare Ashcraft*, 2025 WL 882752, at *3 (listing possible elements of a more "severe" GBS initial medical course).

Petitioner's GBS residual symptoms were documented to be mild, but persistent. First, from November 15 – December 2, 2021, he underwent six PT sessions and one OT session focused on improving his balance, gait, endurance, transfers, and self-care. Those therapies were provided through home health and noted his initial reliance on a cane. But the discharge summary indicates that Petitioner had zero pain, required no assistive devices, and had achieved all goals (despite reported ongoing numbness and tingling in his hands and feet). *See generally* Ex. 5.

Petitioner also followed up periodically with the outpatient neurologist who had first identified his GBS. A November 19, 2021 record reflects that Petitioner was "extremely pleased" with his hospital care; his IVIg treatment had delivered a 50% improvement in symptoms; and the neurologist was content with a "watch, wait, and see approach" over

---

[4] A Romberg sign is defined as "swaying of the body or falling when standing with the feet close together and the eyes closed." Dorland's Med. Dictionary Online, *Romberg Sign*, https://www.dorlandsonline.com/dorland/definition?id=106448 (last accessed June 20, 2025).

[5] Petitioner was discharged from the hospital with a limited prescription for oxycodone-acetaminophen (Percocet) to take as needed for acute pain, Ex. 3 at 26. But subsequent records indicate that he had zero pain and was not taking any pain medication. Ex. 5 at 34, 38, 61; Ex. 4 at 22.

the next few weeks. Ex. 4 at 22 – 24. A December 8, 2021 record confirms that Petitioner was progressively recovering from GBS, he had been able to walk 6,000 steps in a day despite some "remnant complaints of paresthesia," and he would resume working (as a security guard at a cancer hospital) without restrictions. *Id.* at 21, 60. Petitioner was instructed not to receive further flu vaccines due to his GBS history. Ex. 4 at 59; Ex. 2 at 27. On January 5, 2022, the neurologist prescribed a trial of Cymbalta, to replace Petitioner's use of his wife's gabapentin, for complaints of "a crawling sensation in his legs, occurring more prominently in the evening." Ex. 4 at 18 – 20. On March 24, 2022, Petitioner reported a one-month history of "flare-ups" of hand swelling, and paresthesia in his hands and feet. *Id.* at 15. The neurologist endorsed these symptoms as GBS residual effects, which "can take an extended period of time to resolve, if ever." But in April 2022, the neurologist interpreted his own EMG/NCV studies as showing no evidence of neuropathy, and he did not offer any further treatment – noting Petitioner's feeling that past prescription medications (e.g., Cymbalta?) had been "ineffective." *Id.* at 12 – 14, 39 – 58. In May 2022, Petitioner received a single chiropractic adjustment to address "occasional" pain throughout his spine, with associated pain, "pins and needles," and numbness radiating to his hands, and numbness in his feet. Ex. 7 at 11 – 13.

After roughly an eight-month gap (at least in record documentation of treatment),[6] in mid-January 2023, Petitioner attended an initial evaluation with a neuromuscular specialist at the University of Southern Florida. Ex. 8 at 12. The record documented "intermittent paresthesias in both of his knees… about 2 – 3 times per week, and typically last[ing] for 5 – 10 minutes"; difficulty extending his left hand and tying fishing knots; and deficits in sensation, reflexes, and gait. *Id.* at 15 – 16. The specialist tentatively assessed that Petitioner had suffered a "very mild Guillain-Barré syndrome" with residual nerve damage "possibl[y]… exacerbat[ed]" by his anemia. *Id.* at 16.

In April 2023, the neuromuscular specialist conducted repeat EMG/NCV studies, which read as "mildly abnormal," showing a "mild, non-length dependent polyneuropathy with features of acquired segmental demyelination" particularly affecting the left median and ulnar nerves. Ex. 8 at 21.[7] The specialist maintained the assessment of GBS residual nerve damage, adding that "some of [Petitioner's] symptoms may have been exacerbated by anemia which has recently improved [with iron infusions], as well as be attributable to osteoarthritis in his hands." *Id.* at 10. The neuromuscular specialist did not offer any

---

[6] Of note, the last-filed records from primary care or any specialists at the VA are from February 2022, and the VA clinic supplied that batch of records in May 2022, Ex. 2.

[7] Compared to the April 2022 EMG/NCV studies conducted by a local neurologist, the April 2023 EMG/NCV studies conducted by the neuromuscular specialist appear to be more thorough, specifically including the median and ulnar nerves which were found to be abnormal on the latter studies. *Compare* Ex. 4 at 39 – 58; Ex. 8 at 21 – 25.

treatment – only recommending follow-up EMG/NCV studies and consultation, *id.*, which apparently have not occurred. A November 2023 cardiology appointment (as well as a June 2024 neurology follow-up evaluation) document ongoing, "mild" weakness and balance issues from GBS, but no further treatment. Petitioner mentioned that he did not want steroid treatments because he had recently achieved a significant weight loss with the prescription medication Mounjaro, but he was interested in hyperbaric oxygen therapy. Ex. 10 at 7 – 9, 4 – 6 (organized chronologically).

The evidence thus supports the conclusion that Petitioner has ongoing sensation, balance, and stamina issues which likely impacted his daily life for three or more years since his GBS onset. But several treating providers characterized those symptoms as mild, and Petitioner has opted to manage them conservatively – with only intermittent reevaluations, and no particular treatment after his trial of Cymbalta (apparently discontinued within seven months post-vaccination). Neither his medical records nor his affidavit (Ex. 9) identify extenuating or long-term impacts on his employment or on personal obligations (e.g., to children or other family members).

Thus, the amount of any pain and suffering award should fall somewhere within the range of "typical" GBS cases, which very often feature long-term residual symptoms but not necessarily ongoing care. *Ashcraft*, 2025 WL 882752, at *8. In advocating for an award of "less than $160,000.00," Respondent noted one treater's concern that unrelated conditions might explain "some" of Petitioner's ongoing complaints. Response at 1, 6, citing Ex. 8 at 10. But that does not equate to preponderant evidence of a wholly unrelated explanation – because Petitioner was only assessed with osteoarthritis in his hands (which obviously would not explain decreased sensation and weakness in his legs, or poor balance). And even after his anemia was treated with iron infusions, the symptoms persisted.

Respondent also points to a reasoned opinion awarding $92,500.00 for past pain and suffering. *See Geschwindner v. Sec'y of Health & Hum. Servs.*, No. 17-1558V, 2022 WL 22942770 (Fed. Cl. Spec. Mstr. Oct. 11, 2022), and 2024 WL 938952 (Fed. Cl. Spec. Mstr. Feb. 5, 2024). But true head-to-head comparison to that case is not possible, as Petitioner correctly notes (Reply at 4 and n. 2). The special master in that case later concluded that the claimant's former attorney had abandoned her during the case's damages phase (specifically failing to file complete evidence, or any damages briefing), which warranted relief from judgment pursuant to RCFC 60(b)(6). The original damages determination was withdrawn, and after consideration of additional damages evidence, Respondent proffered an *additional* $27,500.00, resulting in a total past pain and suffering award of $120,000.00. *Geschwindner* thus involves peculiar procedural facts that render it a poor comparison case – for virtually any other context.

Respondent also cited one $92,500.00 award from SPU.[8] But that case involved only eight months of medical record documentation of GBS, and the relevant petitioner agreed that she had achieved a full recovery. A five-figure award for pain and suffering due to GBS will be rare, appropriate only for the mildest circumstances. *See also Ashcraft*, 2025 WL 882752, at *3.

Other cases are more instructive. The first is *Shankar* (awarding $135,000.00)[9], cited in Response at 12. That claimant, as here, had a rather typical initial medical course followed by a good recovery, disclaiming any need for assistive devices or long-term pain medications[10] and returning to work within roughly two months post-vaccination. The *Shankar* petitioner's medical course was somewhat more involved (with an eight-day hospitalization, seven days of IVIg, and nine days of inpatient rehabilitation), but his subsequent treatment gaps were lengthy, and repeat electrodiagnostic studies were "unremarkable for any primary neurogenic etiology." 2022 WL 2196407, at *2 – 3. While Mr. Rodriguez's initial medical course was shorter, he has presented better evidence of long-term injury (including abnormal EMG/NCV findings 19 months post-vaccination, and his neurologists' subsequent endorsement of ongoing GBS residuals). Overall, the comparison to *Shankar* is not unreasonable.

Also instructive is *W.B.* (awarding $155,000.00),[11] cited in Brief at 14. That case also involved a limited initial medical course, followed by substantial improvement within the first two months. But I also accepted the W.B. petitioner's GBS-related leg weakness caused a fall and reinjury of his shoulder, warranting 29 PT sessions over the next nine months. 2020 WL 5509686, at *2 – 3, 5; *see also* Response at 9 – 10. Mr. Rodriguez has not alleged any similar falls or secondary injuries, *see generally* Brief and Reply, and he has self-managed his GBS residuals albeit over a longer period of time.

Based on comparison to *Shankar* and *W.B.*, and my review of this case's evidence, **a fair and appropriate award for pain and suffering in this case is $145,000.00.**

---

[8] *Granville v. Sec'y of Health & Hum. Servs.*, No. 21-2098V, 2023 WL 6441388 (Fed. Cl. Spec. Mstr. Aug. 30, 2023).

[9] *Shankar v. Sec'y of Health & Hum. Servs.*, No. 19-1382V, 2022 WL 2196407 (Fed. Cl. Spec. Mstr. May 5, 2022).

[10] Respondent stated that the *Shankar* award depended on a finding of "significant pain throughout… the injury course," Response at 12, but the decision states only that the *Shankar* petitioner was discharged from the hospital with prescription pain medications – not how long those medications were maintained. And the *Shankar* petitioner's long-term complaints were about decreased sensation and stamina, 2022 WL 2196407, at *2 – 3.

[11] *W.B. v. Sec'y of Health & Hum. Servs.*, No. 18-1634V, 2020 WL 5509686 (Fed. Cl. Spec. Mstr. Aug. 7, 2020).

**Conclusion**

**I hereby award Petitioner a lump sum payment of $146,162.85 (representing compensation in the amounts of $145,000.00 for pain and suffering[12] and $1,162.85 for actual unreimbursable expenses[13]) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[14]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[12] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[13] The parties stipulated to the expenses. Brief at 1; Response at n. 2.

[14] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.